**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SCOTT BALFOUR, DON LEE, KULDEEP SINGH, MATTHEW TEMPLON, and SHELIA VOORHEIS individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| iFIT HEALTH AND FITNESS, INC., a Delaware Corporation, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Scott Balfour, Don Lee, Kuldeep Singh, Matthew Templon, and Shelia Voorheis ("Plaintiffs") individually and on behalf of all others similarly situated, by and through their attorneys, bring this action against Defendant iFIT Health & Fitness Inc., ("iFIT" or "Defendant") and allege as follows:

## INTRODUCTION

1.     Defendant sells iFIT branded fitness equipment that offers users streamed workouts through video touch screens/monitors mounted and permanently affixed to the equipment ("Consoles"). Owners can only initiate and conduct workouts on the iFIT equipment through use of the Consoles. Defendant pushed an automatic, mandatory software update to iFIT the equipment that rendered the Consoles thereon totally inoperable. Notably, Defendant did not inform Plaintiffs and Class members of the software update, give them an option to accept or reject it, or even require them to take any affirmative steps to install it on their equipment. Instead, iFIT automatically "pushed" the software update onto the iFIT equipment and its ramifications on

Plaintif and the class. As a result, Plaintiffs and all Class members are unable to use their iFIT equipment.

2.    Specifically, Defendant is a long-time purveyor of at-home fitness equipment—such as treadmills, stationary bikes, elliptical machines, rowers and other strength training equipment—sold through its brands iFIT®, NordicTrack®, ProForm®, Freemotion®, Weider®, Weslo®, 29029®, Sweat®, SpaceSaver™, FreeStride™, Vue™, and Vault™ (among others).

3.    In 2007, prior to changing its corporate name, Defendant debuted what it referred to as iFIT, a workout tracker and content system connected to both Consoles and iFIT-enabled equipment.

4.    In the ensuing years, iFIT morphed into a health and fitness application and streaming platform that offers a wide variety of classes that can be streamed to the Console on iFIT-enabled fitness equipment, or a phone or tablet, to deliver a gym-caliber experience to users in the comfort of their own homes.[1]

## *3 ways to use iFIT*

  

**Use our equipment**     **Use your equipment**     **Just use our app**

---

[1] *Connected Fitness,* iFIT, https://www.iFIT.com/connected-fitness (last visited on January 18, 2023).

5.      Defendant describes the iFIT service—provided through iFIT equipment Consoles—as a "common operating system [that] connects [iFIT's] content to [its] hardware and makes it one interactive platform. It lets [iFIT's] trainers remotely control iFIT equipment in real time to adjust conditions like speed, incline, resistance and digital weight during livestreamed classes. The result is an interactive, touchless workout experience nobody else can deliver."[2]

6.      Defendant grew iFIT into a content provider in order to gain market share in the at-home fitness market currently dominated by companies like Peloton, which offer not only top-of-the-line equipment, but also proprietary fitness classes streamed directly to screens embedded in the equipment itself.

7.      Accordingly, Defendant now sells proprietary iFIT enabled fitness equipment with permanently affixed Consoles ("Class Devices"), the key sales proposition for which is the on-demand availability of iFIT fitness classes through the equipment's Consoles.

8.      Because of the additional capabilities, described above, that iFIT enabled fitness equipment has over the competition, iFIT sells the equipment at a premium. For the same reason, iFIT capabilities are an integral and inseparable part of the Class Devices sold by iFIT.

9.      The ability to stream iFIT classes to the equipment's Consoles is the sole material distinguishing feature of Class Devices, and the sole reason for the price premium paid for the Class Devices when compared to similar fitness devices which are sold without iFIT.

10.     For instance, an iFIT enabled stationary bike bearing the iFIT Console is sold at a premium when compared to a stationary bike without iFIT solely because the user of the iFIT bike is willing to pay a premium for the capability to stream iFIT classes to the device's Console.

---

[2] *Our* Story, iFIT, https://company.ifit.com/en/our-story/ (last visited on January 18, 2023).

11.    Only after Plaintiffs and Class members bought their Console-bearing Class Devices paying for the iFIT service, and iFIT "pushed" an automatic software update—that did not prompt users to accept it or require them to take any affirmative steps to install it—did they discover that their Class Devices that they purchased at a substantial premium over traditional offerings were stuck on error screens that effectively rendered them useless.

12.    Specifically, consumers owning Class Devices report that following a mandatory software update, the Console becomes frozen and the equipment no longer operates, irrespective of whether the consumer wants to stream a workout through iFIT, or just wants to utilize the equipment without any iFIT features— rendering the fitness equipment completely useless (the "Defect"). Below is an image of the error screen caused by the software update Defendant pushed to Class Devices:



13.    Defendant has yet to cure the Defect, and instead suggests that consumers perform a factory pinhole reset. However, the factory reset is ineffective and their Console, and, in turn, their entire iFIT equipment, remains inoperable.

14.    Plaintiffs and Class members had no way of knowing prior to purchasing their iFIT Class Devices that Defendant would push a mandatory, unavoidable software update rendering them totally inoperable.

15.    Accordingly, Plaintiffs on behalf of themselves and all others similarly situated, bring this action to redress Defendant's violations of the Magnuson Moss Warranty Act, and also seek recovery for Defendant's breach of express warranty, breach of various implied warranties, unjust enrichment, negligent misrepresentation, and fraudulent concealment.

## PARTIES

**A.    Plaintiff Scott Balfour**

16.    Plaintiff Scott Balfour resides in Olmstead Township, Ohio.

17.    In or about November 11, 2019, Plaintiff Balfour purchased a ProForm PRO2000 treadmill[3], depicted below, equipped with a Console screen for streaming workouts through iFIT's streaming service:



---

[3] https://www.proform.com/treadmills/pro2000 (last visited on January 18, 2023).

18.     The Console functionality and iFIT's streamed workouts were the main reason why Plaintiff Balfour purchased the ProForm PRO2000 treadmill.

19.     Plaintiff Balfour purchased the ProForm PRO2000 treadmill directly from ProForm's website for $1,740.16. Prior to doing so, Plaintiff Balfour visited iFIT's and/or ProForm's website to research their lineup of screen-equipped treadmills enabled with iFIT's workout streaming capabilities. iFIT and/or ProForm marketed and advertised the ProForm 2000 treadmill as having a "10" HD Touchscreen Display" that allowed users to "Follow personal trainers through beautiful destinations right on the display with the 10-inch touchscreen. With the swipe of a finger, you can also access all of your workout stats so you can keep an eye on your progress."[4]

20.     iFIT/ProForm represented to Plaintiff Balfour that the Console on his ProForm PRO2000 treadmill offered the following features and functionality[5]:

> The treadmill console offers an impressive array of features designed to make your workouts more effective and enjoyable. When you use the manual mode, you can change the speed and incline of the treadmill with the touch of a button. As you exercise, the console will display Instant exercise feedback. You can also measure your heart rate using the handgrip heart rate monitor or the chest heart rate monitor. In addition, the console features a selection of onboard workouts. Each workout automatically controls the speed and incline of the treadmill as it guides you through an effective exercise session.
>
> The console also features an iFit mode that enables the treadmill to communicate with your wireless network through an optional Fit module. With the Fit mode, you can download personalized workouts, create your own workouts, track your workout results, race against other (Fit users, and access many other features. To

---

[4] https://www.bestbuy.com/site/proform-pro-2000-black/6450644.p?skuId=6450644&ref=212&loc=1&gclid=Cj0KCQiAq5meBhCyARIsAJrtdr7eeKVesfEvSXW7onxtwn5Sm9xokI3nBQFRfkl4hJkeTtnMgrzOuPYaAiMTEALw_wcB&gclsrc=aw.ds (last visited on January 18, 2023).
[5]
https://www.costco.com/wcsstore/CostcoUSBCCatalogAssetStore/Attachment/100292730_Owners_Manual.pdf (last visited on January 18, 2023).

purchase an IFIt module at any time, go to www.Fit.com or call the telephone number on the front cover of this manual.

You can even listen to your favorite workout music or audio books with the console's sound system while you exercise.

Thus, the Console on Plaintiff Balfour's ProForm PRO2000 treadmill is central to the functionality of the entire device and why Plaintiff Balfour purchased it. Without a functioning Console, the treadmill is rendered useless.

21.     Nowhere on the ProForm PRO2000 treadmill's page or any other iFIT/ProForm webpage did Defendant disclose the Defect to Plaintiff Balfour.

22.     On or about November 25, 2022, Plaintiff Balfour attempted to perform a workout on his treadmill and discovered that the Console screen was displaying a white screen bearing only the iFIT logo on it. The Console and, in turn, treadmill were totally inoperable. Plaintiff Balfour reviewed the instruction manual, specifically page 34 which states, "SYMPTOM: The displays of the console do not function properly." The instructions provided on iFIT's ProForm website provide directions on how to reset the Console using the pinhole reset switch, which are as follows[6]:

# How To Do A Factory Reset On A NordicTrack Machine

If your built-in console or the iFIT app has stopped responding, or if your Wi-Fi™ connection is still poor after you have reset your router, a factory reset might be your solution.

Factory reset, however, only works on the latest consoles. To see if your NordicTrack machine is compatible with this process, look at your settings, and verify your firmware version. Versions available for factory reset begin with 7.1. You can also see if your

---

[6] https://www.nordictrack.com/learn/ifit-help-factory-reset-on-machine/#:~:text=To%20locate%20the%20switch%20on,please%20consult%20your%20owner's%20manual. (last visited on January 18, 2023).

machine is compatible by looking at your console. If your machine has a USB or an HDMI port, it is not compatible with this process.

# Getting Started



We recommend that you complete a factory reset with two people. Make sure that your Wi-Fi™ is turned on, and that you have a paperclip on hand.

First, locate and turn off the power to your equipment by flipping the power switch to the off position. To locate the switch on your equipment, check your owner's manual. If your machine is a NordicTrack rower, simply unplug it.

Next, locate the pinhole, which will most likely be found on one of the sides or on the back of your console. If you have difficulty finding it, please consult your owner's manual.

Insert the paper clip into the pinhole. As you insert the paper clip, press, and hold it down. As you hold the paper clip, have the second person flip the power switch back on. Once your machine's screen lights up, you may remove the paper clip.

You will see the iFIT logo along with "*system recovery: please wait…*" highlighted in blue. This is the boot-up screen. If the blue text doesn't appear, please repeat the reset process. If the boot-up screen and blue text reads, "*system recovery: please wait…*", it may take up to 30 minutes for your machine to begin the onboarding process. If the boot-up screen remains over 30 minutes, the reset process will need to be attempted again.

If the factory reset has worked, you will be prompted to reconnect to your Wi-Fi™, select your unit of measure, and choose your time zone. Once connected to Wi-Fi™, your NordicTrack machine will automatically update to the most current software––this could take a few minutes.

Once your iFIT logo screen has loaded, please log in using your iFIT username and password. You will now be able to begin a new workout journey on your machine.

After following the instructions and performing the reset, the Console displayed a black screen with an error message in the bottom left corner of the screen that read "Supported API:3" and continued to be inoperable.

23.    Plaintiff Balfour contacted iFIT (for the ProForm brand) that same day via its online chat feature, and was informed that would iFIT would order him a new Console, but the chat was disconnected before the ordering process was completed. Later that day, Plaintiff Balfour called iFIT and was told that if an order was placed, the Console would be received in 8 to 12 days, but the iFIT customer service representative could not confirm if an order had been placed. When about 12 days passed without Plaintiff Balfour receiving the replacement Console, he called iFIT again on or about December 12, 2022 and, again, the iFIT employee informed him that they were shipping him a new Console that would arrive within 8-12 days. The phone call was disconnected before an order was confirmed. That same day, Plaintiff Balfour contacted iFIT via Twitter direct message (DM). iFIT provided Plaintiff Balfour with order number ICS9559842 and purportedly shipped him a new Console. To date, iFIT has not provided Plaintiff Balfour with a replacement Console or otherwise fixed the Defect. As a result, Plaintiff Balfour's treadmill has been rendered totally inoperable from November 25, 2022 through present.

24.    iFIT warranted Plaintiff Balfour's ProForm PRO2000 treadmill to be "free from defects in workmanship and material," and provided a 5-year parts warranty stating, "Parts and electronics are warranted for five years from the date of purchase. Labor is warranted for two years from the date of purchase."

25.    As a result of Defendant's inability to cure the Defect, Plaintiff Balfour has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the

misrepresentations and omissions described herein and/or disclosed the Defect, Plaintiff Balfour would not have purchased his ProForm PRO2000 treadmill or would have paid less for it.

**B.**    **Plaintiff Don Lee**

26.    Plaintiff Don Lee resides in San Rafael, California.

27.    In or about January 2020, Plaintiff Lee purchased a ProForm Performance 800i treadmill[7], depicted below, equipped with a Console screen for streaming workouts through iFIT's streaming service:



28.    The Console functionality and iFIT's streamed workouts were the main reason why Plaintiff Lee purchased the ProForm Performance 800i treadmill.

29.    Plaintiff Lee purchased the ProForm Performance 800i treadmill directly from ProForm's website for $1,197.92. Prior to doing so, Plaintiff Lee visited iFIT's and/or ProForm's website to research their lineup of screen-equipped treadmills enabled with iFIT's workout streaming capabilities. iFIT and/or ProForm marketed and advertised the ProForm 800i treadmill

---

[7] https://www.proform.com/review/product/86638 (last visited on January 18, 2023).

as having a "14" HD Touchscreen Display" that allowed users to "[f]ully engage in your iFIT training experience and keep track of your workout stats on a large 14" smart HD touchscreen."[8]

30.     iFIT/ProForm represented to Plaintiff Lee that the Console on his ProForm Performance 800i treadmill offered the following features and functionality[9]:

> offers a selection of features designed to make your workouts more effective and enjoyable. When you use the manual mode, you can change the speed and incline of the treadmill with the touch of a button. As you exercise, the console will display instant exercise feedback. You can even measure your heart rate using the handgrip heart rate monitor or the chest heart rate monitor. In addition, the console features a selection of onboard workouts. Each workout automatically controls the speed and incline of the treadmill as it guides you through an effective exercise session. The console also features an iFit mode that enables the treadmill to communicate with your wireless network through an optional iFit module. With the iFit mode, you can download personalized workouts, create your own workouts, track your workout results, race against other iFIt users, and access many other features. To purchase an iFit module at any time, go to www.iFit.com or call the telephone number on the front cover of this manual. You can even listen to your favorite workout music or audio books with the console's sound system while you exercise.

Thus, the Console on Plaintiff Lee's ProForm Performance 800i treadmill is central to the functionality of the entire device and why Plaintiff Lee purchased it. Without a functioning Console, the treadmill is rendered useless.

31.     Nowhere on the ProForm Performance 800i treadmill's page or any other iFIT/ProForm webpage did Defendant disclose the Defect to Plaintiff Lee.

32.     On or about January 9, 2023, Plaintiff Lee discovered that iFIT had automatically pushed a software update to the Console of his device that rendered the Console—and, in turn, entire treadmill—inoperable. Specifically, Plaintiff Lee's wife attempted to perform a workout on

---

[8] https://www.walmart.com/ip/ProForm-SMART-Performance-800i-Treadmill-with-14-HD-Touchscreen-and-30-Day-iFIT-Membership/158700617 (last visited on January 18, 2023).

[9] https://res.cloudinary.com/iconcdn/image/upload/v1595538510/nordictrack.com/cdn/pdf/NTL11219.3-418771.pdf (last visited on January 18, 2023).

Plaintiff Lee's ProForm Performance 800i treadmill and discovered that the Console screen was in the middle of loading a software update. Several minutes later, the device's Console went into a "rebooting" cycle, and then displayed a white screen with the iFIT logo on it, then switched to a black screen as if the machine was off and repeated back and forth through those screens for the rest of the day and two ensuing days until Plaintiff Lee finally turned off the treadmill. Plaintiff Lee attempted to reset the Console using the pinhole reset switch, according to the instructions provided on iFit's NordicTrack website, which provides as follows[10]:

## How To Do A Factory Reset On A NordicTrack Machine

If your built-in console or the iFIT app has stopped responding, or if your Wi-Fi™ connection is still poor after you have reset your router, a factory reset might be your solution.

Factory reset, however, only works on the latest consoles. To see if your NordicTrack machine is compatible with this process, look at your settings, and verify your firmware version. Versions available for factory reset begin with 7.1. You can also see if your machine is compatible by looking at your console. If your machine has a USB or an HDMI port, it is not compatible with this process.

## Getting Started

---

[10] https://www.nordictrack.com/learn/ifit-help-factory-reset-on-machine/#:~:text=To%20locate%20the%20switch%20on,please%20consult%20your%20owner's%20manual. (last visited on January 18, 2023).



We recommend that you complete a factory reset with two people. Make sure that your Wi-Fi™ is turned on, and that you have a paperclip on hand.

First, locate and turn off the power to your equipment by flipping the power switch to the off position. To locate the switch on your equipment, check your owner's manual. If your machine is a NordicTrack rower, simply unplug it.

Next, locate the pinhole, which will most likely be found on one of the sides or on the back of your console. If you have difficulty finding it, please consult your owner's manual.

Insert the paper clip into the pinhole. As you insert the paper clip, press, and hold it down. As you hold the paper clip, have the second person flip the power switch back on. Once your machine's screen lights up, you may remove the paper clip.

You will see the iFIT logo along with "*system recovery: please wait…*" highlighted in blue. This is the boot-up screen. If the blue text doesn't appear, please repeat the reset process. If the boot-up screen and blue text reads, "*system recovery: please wait…*", it may take up to 30 minutes for your machine to begin the onboarding process. If the boot-up screen remains over 30 minutes, the reset process will need to be attempted again.

If the factory reset has worked, you will be prompted to reconnect to your Wi-Fi™, select your unit of measure, and choose your time zone. Once connected to Wi-Fi™, your NordicTrack machine will automatically update to the most current software––this could take a few minutes.

Once your iFIT logo screen has loaded, please log in using your iFIT username and password. You will now be able to begin a new workout journey on your machine.

After performing the pinhole reset in accordance with iFIt's instructions, Plaintiff Lee's Console screen continued to be inoperable.

33.     Plaintiff Lee's treadmill has been rendered totally inoperable since, as a result of this Defect.

34.     That same day, Plaintiff Lee contacted iFIT about the Defect, but was unable to speak with a customer service representative. Plaintiff Lee followed iFIT's automated prompts to request a call back from a representative but, to date, has not received that call.

35.     iFIT warranted Plaintiff Lee's ProForm Performance 800i treadmill to be "free from defects in workmanship and material," and provided a 3-year parts warranty[11]:

## LIMITED WARRANTY

**IMPORTANT: To protect your fitness equipment with an extended service plan, see page 6.**

ICON Health & Fitness, Inc. (ICON) warrants this product to be free from defects in workmanship and material, under normal use and service conditions. The frame and drive motor are warranted for the life-time of the original purchaser (customer). Parts are warranted for three (3) years from the date of purchase. Labor is warranted for one (1) year from the date of purchase.

The 3-year parts warranty is due to expire on January 26, 2023. Thus, upon information and belief, Plaintiff Lee alleges that Defendant has not returned his customer service call to allow the parts warranty to expire before he is able to order a replacement Console for his treadmill.

36.     As a result of Defendant's inability to cure the Defect, Plaintiff Lee has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the misrepresentations and omissions described herein and/or disclosed the Defect, Plaintiff Lee would not have purchased his ProForm Performance 800i treadmill, or would have paid less for it.

**C.     Plaintiff Kuldeep Singh**

---

[11] https://www.costco.com/wcsstore/CostcoUSBCCatalogAssetStore/Attachment/100293660_Owners_Manual.pdf (last visited on January 18, 2023).

37.     Plaintiff Kuldeep Singh resides in San Mateo, California.

38.     In or about September 12, 2020, Plaintiff Singh purchased a NordicTrack T8.5S treadmill[12], depicted below, equipped with a Console screen for streaming workouts through iFIT's streaming service:



39.     The Console functionality and iFIT's streamed workouts were the main reason why Plaintiff Singh purchased the NordicTrack T8.5S treadmill.

40.     Plaintiff Singh purchased the NordicTrack T8.5S treadmill directly from NordicTrack's website for $1,699. Prior to doing so, Plaintiff Singh visited iFIT's and/or NordicTrack's website to research their lineup of screen-equipped treadmills enabled with iFIT's workout streaming capabilities. iFIT and/or NordicTrack marketed and advertised the NordicTrack T8.5S treadmill as having a "10" HD Interactive Touchscreen Display" that allowed users to "stream[] on-demand iFit workouts into your home directly on your treadmill; SMART-Response motor for effective running and cardio training at home."[13]

---

[12] https://www.amazon.com/8-5-Treadmill-30-Day-iFIT-Membership/dp/B07H16Y49B/ref=cm_cr_arp_d_product_top?ie=UTF8&th=1 (last visited January 18, 2023).
[13] *Id.*

41.     iFIT/NordicTrack represented to Plaintiff Singh that the Console on his NordicTrack T8.5S treadmill offered the following features and functionality[14]:

> offers a selection of features designed to make your workouts more effective and enjoyable. The console features wireless technology that enables the console to connect to iFit. With iFit, you can access a large and varied workout library, create your own workouts, track your workout results, and access many other features. When you use the manual mode, you can change the speed and incline of the treadmill with the touch of a button. As you exercise, the console will display instant exercise feedback. You can even measure your heart rate using the handgrip heart rate monitor …. In addition, the console features a selection of workouts. Each workout automatically controls the speed and incline of the treadmill as it guides you through an effective exercise session. You can even listen to your favorite workout music or audio books with the console's sound system while you exercise.

Thus, the Console on Plaintiff Singh's NordicTrack T8.5S treadmill is central to the functionality of the entire device and why Plaintiff Singh purchased it. Without a functioning Console, the treadmill is rendered useless.

42.     Nowhere on the NordicTrack T8.5S treadmill's page or any other iFIT/ProForm webpage did Defendant disclose the Defect to Plaintiff Singh.

43.     On or about January 1, 2023, Plaintiff Singh attempted to use his treadmill and discovered that iFIT had automatically pushed a software update to the Console of his device that rendered the Console—and, in turn, entire treadmill—inoperable. Specifically, discovered that the Console screen was in the middle of loading a software update. Several minutes later, the device's Console went into a "rebooting" cycle, and then displayed a white screen with the iFIT logo on it, then switched to a black screen as if the machine was off and repeated back and forth through those screens for the rest of the day until Plaintiff Singh powered off the treadmill. Plaintiff Singh

---

[14] https://res.cloudinary.com/iconcdn/image/upload/v1595538510/nordictrack.com/cdn/pdf/NTL11219.3-418771.pdf (last visited on January 18, 2023).

attempted to reset the Console using the pinhole reset switch, according to the instructions provided on iFit's NordicTrack website, which provides as follows[15]:

# How To Do A Factory Reset On A NordicTrack Machine

If your built-in console or the iFIT app has stopped responding, or if your Wi-Fi™ connection is still poor after you have reset your router, a factory reset might be your solution.

Factory reset, however, only works on the latest consoles. To see if your NordicTrack machine is compatible with this process, look at your settings, and verify your firmware version. Versions available for factory reset begin with 7.1. You can also see if your machine is compatible by looking at your console. If your machine has a USB or an HDMI port, it is not compatible with this process.

## Getting Started



We recommend that you complete a factory reset with two people. Make sure that your Wi-Fi™ is turned on, and that you have a paperclip on hand.

First, locate and turn off the power to your equipment by flipping the power switch to the off position. To locate the switch on your equipment, check your owner's manual. If your machine is a NordicTrack rower, simply unplug it.

---

[15] https://www.nordictrack.com/learn/ifit-help-factory-reset-on-machine/#:~:text=To%20locate%20the%20switch%20on,please%20consult%20your%20owner's%20manual. (last visited on January 18, 2023).

17

Next, locate the pinhole, which will most likely be found on one of the sides or on the back of your console. If you have difficulty finding it, please consult your owner's manual.

Insert the paper clip into the pinhole. As you insert the paper clip, press, and hold it down. As you hold the paper clip, have the second person flip the power switch back on. Once your machine's screen lights up, you may remove the paper clip.

You will see the iFIT logo along with "*system recovery: please wait…*" highlighted in blue. This is the boot-up screen. If the blue text doesn't appear, please repeat the reset process. If the boot-up screen and blue text reads, "*system recovery: please wait…*", it may take up to 30 minutes for your machine to begin the onboarding process. If the boot-up screen remains over 30 minutes, the reset process will need to be attempted again.

If the factory reset has worked, you will be prompted to reconnect to your Wi-Fi™, select your unit of measure, and choose your time zone. Once connected to Wi-Fi™, your NordicTrack machine will automatically update to the most current software––this could take a few minutes.

Once your iFIT logo screen has loaded, please log in using your iFIT username and password. You will now be able to begin a new workout journey on your machine.

After performing the pinhole reset in accordance with iFit's instructions, Plaintiff Singh's Console screen displayed a circle with the words "erasing" displayed below it, and has remained on that screen since, rendering the treadmill useless.

44.     Plaintiff Singh's treadmill has been rendered totally inoperable since, as a result of this Defect.

45.     On or about that same day, Plaintiff Singh contacted iFIT about the Defect, both through its online chat function, and also over the phone but was placed on hold for hours before finally hanging up. Thus, Plaintiff Singh was unable to speak with a customer service representative.

46.     iFIT warranted Plaintiff Singh's NordicTrack T8.5S treadmill to be "free from defects in workmanship and material," and provided a 2-year parts warranty:

## LIMITED WARRANTY

**IMPORTANT: To protect your fitness equipment with an extended service plan, see page 5.**

ICON Health & Fitness, Inc. (ICON) warrants this product to be free from defects in workmanship and material, under normal use and service conditions. The frame is warranted for ten (10) years from the date of purchase. Parts are warranted for two (2) years from the date of purchase. Labor is warranted for one (1) year from the date of purchase.

47.    As a result of Defendant's inability to cure the Defect, Plaintiff Singh has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the misrepresentations and omissions described herein and/or disclosed the Defect, Plaintiff Singh would not have purchased his NordicTrack T8.5S treadmill or would have paid less for it.

**D.    Plaintiff Matthew Templon**

48.    Plaintiff Matthew Templon resides in Seattle, Washington.

49.    In or about May 2019, Plaintiff Templon purchased a NordicTrack 6.5si treadmill[16], depicted below, equipped with a Console screen for streaming workouts through iFIT's streaming service:



---

[16] https://www.walmart.com/ip/NordicTrack-T-6-5-Si-Series-Treadmill/216717928 (last visited on January 18, 2023).

50.    The Console functionality and iFIT's streamed workouts were the main reason why Plaintiff Templon purchased the NordicTrack 6.5si treadmill.

51.    Plaintiff Templon purchased the NordicTrack 6.5si treadmill from Amazon for $825. Prior to doing so, Plaintiff Templon visited iFIT's and/or NordicTrack's website to research their lineup of screen-equipped treadmills enabled with iFIT's workout streaming capabilities. iFIT and/or ProForm marketed and advertised the NordicTrack 6.5si treadmill as having an "Immersive 10-inch interactive HD touchscreen streams on-demand iFit workouts directly to your equipment and provides easy stats tracking; Smart-Response motor for effective running and cardio training."[17]

52.    iFIT/ProForm represented to Plaintiff Templon that the Console on his NordicTrack 6.5si treadmill offered the following features and functionality[18]:

> The advanced treadmill console offers a selection of features designed to make your workouts more effective and enjoyable.
> The console features wireless technology that enables the console to connect to iFit. With iFit, you can access a large and varied workout library, create your own workouts, track your workout results, and access many other features.
> When you use the manual mode, you can change the speed and incline of the treadmill with the touch of a button. As you exercise, the console will display instant exercise feedback. You can even measure your heart rate using the handgrip heart rate monitor or a compatible heart rate monitor. See page 27 for information about purchasing an optional chest heart rate monitor.
>
> In addition, the console features a selection of workouts. Each workout automatically controls the speed and incline of the treadmill as it guides you

---

[17] *Id*.
[18] https://www.manualslib.com/manual/2259469/Nordictrack-T6-5-Si.html?page=17#manual (last visited on January 18, 2023).

> through an effective exercise session.
> You can even listen to your favorite workout music or
> audio books with the console's sound system while you
> exercise.

Thus, the Console on Plaintiff Templon's NordicTrack 6.5si treadmill is central to the functionality of the entire device and why Plaintiff Templon purchased it. Without a functioning Console, the treadmill is rendered useless.

53.    Nowhere on the NordicTrack 6.5si treadmill's page or any other iFIT/ProForm webpage did Defendant disclose the Defect to Plaintiff Templon.

54.    On or about January 8, 2023, Plaintiff Templon went to use his treadmill but discovered that iFIT had automatically pushed a software update to the Console of his device that rendered the Console—and, in turn, entire treadmill—inoperable. Specifically, Plaintiff Templon attempted to perform a workout on his treadmill and discovered that the Console screen displayed a message that settings could not load and a restart was necessary. After resetting the treadmill, Plaintiff Templon observed that the Console was displaying a white page and would not progress/continue its startup past that screen loading. The Console and, in turn, treadmill were totally inoperable.

55.    Plaintiff Templon called iFIT that same day and waited on hold for four hours until his call was ultimately disconnected without him having an opportunity to speak with an iFIT employee. On January 11, 2023, Plaintiff Templon called iFIT again and the iFIT employee with whom he spoke stated, "this is not our problem, it's an Android problem, it will cost you $425 for your machine to work."

56.    Plaintiff Templon's treadmill has been rendered totally inoperable from on or about January 8, 2023 through the present.

57.    iFIT warranted Plaintiff Templon's NordicTrack 6.5si treadmill to be "free from defects in workmanship and material," and provided a 1-year parts warranty[19]:

## LIMITED WARRANTY

**IMPORTANT: To protect your fitness equipment with an extended service plan, see page 5.**

ICON Health & Fitness, Inc. (ICON) warrants this product to be free from defects in workmanship and material, under normal use and service conditions. The frame is warranted for the lifetime of the original purchaser (customer). The motor is warranted for twenty-five (25) years from the date of purchase. Parts and labor are warranted for one (1) year from the date of purchase.

58.    As a result of Defendant's inability to cure the Defect, Plaintiff Templon has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the misrepresentations and omissions described herein and/or disclosed the Defect, Plaintiff Templon would not have purchased his NordicTrack 6.5si treadmill or would have paid less for it.

**E.    Plaintiff Shelia Voorheis**

59.    Plaintiff Voorheis resides in St. Johns, Florida.

60.    In or about August 2019, Plaintiff Voorheis purchased a NordicTrack T6.5SI treadmill[20], depicted below, equipped with a Console screen for streaming workouts through iFIT's streaming service:

---

[19] https://images-na.ssl-images-amazon.com/images/I/B1XhqOVXxmS.pdf (last visited on January 18, 2023).
[20] https://www.walmart.com/ip/NordicTrack-T-6-5-Si-Series-Treadmill/216717928 (last visited on January 18, 2023).



61.    The Console functionality and iFIT's streamed workouts were the main reason why Plaintiff Voorheis purchased the NordicTrack T6.5SI treadmill.

62.    Plaintiff Voorheis purchased the NordicTrack 6.5si treadmill directly from NordicTrack's website for $1,281.85. Prior to doing so, Plaintiff Voorheis visited iFIT's and/or NordicTrack's website to research their lineup of screen-equipped treadmills enabled with iFIT's workout streaming capabilities. iFIT and/or ProForm marketed and advertised the NordicTrack 6.5si treadmill as having an "Immersive 10-inch interactive HD touchscreen streams on-demand iFit workouts directly to your equipment and provides easy stats tracking; Smart-Response motor for effective running and cardio training."[21]

63.    iFIT/NordicTrack represented to Plaintiff Voorheis that the Console on her NordicTrack T6.5SI treadmill offered the following features and functionality[22]:

> The advanced treadmill console offers a selection of
> features designed to make your workouts more effec-
> tive and enjoyable.
> The console features wireless technology that enables
> the console to connect to iFit. With iFit, you can access
> a large and varied workout library, create your own

---

[21] *Id.*

[22] https://www.manualslib.com/manual/2259469/Nordictrack-T6-5-Si.html?page=17#manual (last visited on January 18, 2023).

workouts, track your workout results, and access many
other features.
When you use the manual mode, you can change the
speed and incline of the treadmill with the touch of a
button. As you exercise, the console will display instant
exercise feedback. You can even measure your heart
rate using the handgrip heart rate monitor or a compat-
ible heart rate monitor. See page 27 for information
about purchasing an optional chest heart rate
monitor.

In addition, the console features a selection of
workouts. Each workout automatically controls the
speed and incline of the treadmill as it guides you
through an effective exercise session.
You can even listen to your favorite workout music or
audio books with the console's sound system while you
exercise.

Thus, the Console on Plaintiff Voorheis's NordicTrack T6.5SI treadmill is central to the
functionality of the entire device and why Plaintiff Voorheis purchased it. Without a functioning
Console, the treadmill is rendered useless.

64.     Nowhere on the NordicTrack T6.5SI treadmill's page or any other iFIT/ProForm
webpage did Defendant disclose the Defect to Plaintiff Voorheis.

65.     On or about January 11, 2023, Plaintiff Voorheis attempted to use her treadmill and
discovered that iFIT had automatically pushed a software update to the Console of her device that
rendered the Console—and, in turn, entire treadmill—inoperable. Specifically, Plaintiff Voorheis
discovered that the Console screen was in the middle of loading a software update, so Plaintiff
Voorheis left her machine. Forty-five minutes later, Plaintiff Voorheis returned to her machine and
discovered that the treadmill's Console was into a "rebooting" cycle, and then displayed a white
screen with the iFIT logo on it, then switched to a black screen as if the machine was off and
repeated back and forth through those screens. Plaintiff Voorheis attempted to reset the Console

using the pinhole reset switch, according to the instructions provided on iFit's NordicTrack website, which provides as follows:[23]

## How To Do A Factory Reset On A NordicTrack Machine

If your built-in console or the iFIT app has stopped responding, or if your Wi-Fi™ connection is still poor after you have reset your router, a factory reset might be your solution.

Factory reset, however, only works on the latest consoles. To see if your NordicTrack machine is compatible with this process, look at your settings, and verify your firmware version. Versions available for factory reset begin with 7.1. You can also see if your machine is compatible by looking at your console. If your machine has a USB or an HDMI port, it is not compatible with this process.

## Getting Started



We recommend that you complete a factory reset with two people. Make sure that your Wi-Fi™ is turned on, and that you have a paperclip on hand.

First, locate and turn off the power to your equipment by flipping the power switch to the off position. To locate the switch on your equipment, check your owner's manual. If your machine is a NordicTrack rower, simply unplug it.

---

[23] https://www.nordictrack.com/learn/ifit-help-factory-reset-on-machine/#:~:text=To%20locate %20the%20switch%20on,please%20consult%20your%20owner's%20manual. (last visited on January 18, 2023).

Next, locate the pinhole, which will most likely be found on one of the sides or on the back of your console. If you have difficulty finding it, please consult your owner's manual.

Insert the paper clip into the pinhole. As you insert the paper clip, press, and hold it down. As you hold the paper clip, have the second person flip the power switch back on. Once your machine's screen lights up, you may remove the paper clip.

You will see the iFIT logo along with "*system recovery: please wait...*" highlighted in blue. This is the boot-up screen. If the blue text doesn't appear, please repeat the reset process. If the boot-up screen and blue text reads, "*system recovery: please wait...*", it may take up to 30 minutes for your machine to begin the onboarding process. If the boot-up screen remains over 30 minutes, the reset process will need to be attempted again.

If the factory reset has worked, you will be prompted to reconnect to your Wi-Fi™, select your unit of measure, and choose your time zone. Once connected to Wi-Fi™, your NordicTrack machine will automatically update to the most current software––this could take a few minutes.

Once your iFIT logo screen has loaded, please log in using your iFIT username and password. You will now be able to begin a new workout journey on your machine.

The pinhole reset in accordance with iFit's instructions did not fix Plaintiff Voorheis' Console or treadmill, rendering it useless.

66.     Plaintiff Voorheis's treadmill has been rendered totally inoperable since, as a result of this Defect.

67.     That same day, Plaintiff Voorheis contacted iFIT's customer service number and spoke with an operator who placed her into a call queue to troubleshoot the issue with her treadmill. Defendant kept Plaintiff Voorheis on hold for an hour and 26 minutes before iFIT offered her to receive a call back from "next available" iFIT employee, which Plaintiff Voorheis accepted. Plaintiff Voorheis did not receive that call back for more than five hours, only for the iFIT representative to inform her that he/she was not the proper iFIT employee to handle her issue and provide her with a different iFIT number to call. Plaintiff Voorheis immediately called that new number but the department was closed for the day.

68.     The next day, on January 12, 2023, Plaintiff Voorheis called Defendant again and spent 47 minutes on the phone with an iFIT representative who attempted to troubleshoot the issue, but was ultimately unsuccessful in repairing Plaintiff Voorheis' treadmill and transferred Plaintiff Voorheis back to the repair queue she was placed in the prior day. After being placed on hold for a substantial duration of time, Defendant's employee informed Plaintiff Voorheis that her treadmill's warranty had expired, and it would cost her $455.20 to fix the issue by purchasing a replacement Console, which Plaintiff Voorheis declined to do.

69.     On January 17, 2023, Plaintiff Voorheis contacted iFIT's non-warranty number and spoke to a supervisor named Brandon for 14 minutes who informed Plaintiff Voorheis that nothing could be done at no cost to fix her treadmill because it was no longer under warranty, and that the issue could not have been caused by the software update iFIT automatically pushed to her treadmill because iFIT had not received any complaints about that—which, upon information and belief, was a blatant lie based upon the allegations herein of widespread consumer complaints of iFIT Class Devices being rendered unusable as a direct result of the software update.

70.     Due to the Defect caused by Defendant's automatic software update and Defendant's failure to fix it, Plaintiff Voorheis' treadmill has been inoperable and useless from January 11, 2023 through the present.

71.     iFIT warranted Plaintiff Voorheis's NordicTrack T6.5SI treadmill to be "free from defects in workmanship and material," and provided a 1-year parts warranty[24]:

---

[24] https://images-na.ssl-images-amazon.com/images/I/B1XhqOVXxmS.pdf (last visited on January 18, 2023).

27

## LIMITED WARRANTY

**IMPORTANT: To protect your fitness equipment with an extended service plan, see page 5.**

ICON Health & Fitness, Inc. (ICON) warrants this product to be free from defects in workmanship and material, under normal use and service conditions. The frame is warranted for the lifetime of the original purchaser (customer). The motor is warranted for twenty-five (25) years from the date of purchase. Parts and labor are warranted for one (1) year from the date of purchase.

72.     As a result of Defendant's inability to cure the Defect, Plaintiff Voorheis has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the misrepresentations and omissions described herein and/or disclosed the Defect, Plaintiff Voorheis would not have purchased his NordicTrack T6.5SI treadmill or would have paid less for it.

**F.    Defendant**

73.     Defendant iFIT Health and Fitness Incorporated is a Delaware corporation headquartered at 1500 South 1000 West Logan, Utah 84321. iFIT and its subsidiaries own or have the rights to various trademarks, trade names, service marks and copyrights, including the following brands: iFIT®, NordicTrack®, ProForm®, Freemotion®, Weider®, Weslo®, 29029® and Sweat®, which are its principal brands, as well as iFIT ActivePulse™, iFIT Mind™, LiveAdjust™, SmartAdjust™, SpaceSaver™, FreeStride™, Vue™, Vault™ and various logos used in association with these terms.[25]

74.     At all times relevant to this action, Defendant, its subsidiaries, and/or its agents manufactured, distributed, sold, and warranted the Class Devices throughout the United States, including the owner's manuals, warranty documents, advertisements, and other promotional materials pertaining thereto.

---

[25] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited January 20, 2023).

## JURISDICTION AND VENUE

75.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (i) there are 100 or more Class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

76.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

77.      This Court has personal jurisdiction over Defendant because it is incorporated in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed its fitness equipment into the stream of commerce within Delaware and throughout the United States.

78.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is incorporated in this district, advertises in this district, and has received substantial revenue and profits from its sales of iFIT equipment in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

## FACTUAL ALLEGATIONS

**A.  iFIT Emphasizes its Workout Streaming Service in its Advertisements to Consumers**

79.      Defendant describes itself as "a health and fitness subscription technology company, fueled by our passion to innovate, grow and provide meaningful solutions for our

members," and touts that it has "over 6.4 million Total Members and more than 1.5 million Total Fitness Subscribers with members in over 120 countries."[26]

80.     Defendant advertises iFIT as "Interactive fitness reimagined" that allows customers to "bring home live events, on-demand Global Workouts and Studio Classes."[27]

81.     Defendant's public-facing statements consistently emphasize that its products are designed to "connect" consumers with interactive workouts through its screen-enabled fitness equipment—the Class Devices and the affixed Consoles thereon—and streamed workout classes:

> We are a health and fitness subscription technology company …. iFIT is an integrated health and fitness platform, **designed to connect our proprietary software, experiential content and interactive hardware** to deliver an unmatched **connected fitness experience** …. We deliver our patented interactive experiences on the industry's broadest range of fitness modalities including treadmills, bikes, ellipticals, rowers, climbers, strength equipment, fitness mirrors, yoga equipment and accessories.

82.     Indeed, Defendant describes the Class Devices as "interactive fitness products" and "connected fitness products" with "iFIT Subscriptions" enabled with the 'iFIT operating system' that "provides interactive experiences on all of [Defendant's] connected equipment brands, allowing members to gain access to [Defendant's] full library of iFIT live and on-demand content."[28] Thus, Defendant considers its fitness equipment and streamed workouts as combining to form one product: "We believe the combination of our proprietary software and experiential content connected with our interactive hardware creates a compelling value proposition for our rapidly growing member base …."[29]

---

[26] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited January 20, 2023).

[27] *Banner Advertising,* https://www.iFIT.com (last visited on August 18, 2022)

[28] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited January 20, 2023).

[29] *Id*.

83.    Defendant's advertisements are centered around its streaming service that users access through their Class Device Consoles and emphasize that its service allows owners of iFIT equipment to stream exercise classes through iFIT's equipment to the Consoles thereon:

> Providing a unique, two-way user experience that keeps our growing community of over 6.4+ million members engaged is the motivation behind iFIT's proprietary software. Our common operating system connects our content to our hardware and makes it one interactive platform. It lets our trainers remotely control iFIT equipment in real time to adjust conditions like speed, incline, resistance and digital weight during livestreamed classes. The result is an interactive, touchless workout experience nobody else can deliver.[30]

84.    The Consoles of Class Devices thus are critical to Defendant's marketing strategy and ability to compete in the at-home fitness market, which companies like Peloton have disrupted. For example, Defendant asserts that Class Devices provide "Endless Training Possibilities[,]" and claims consumers will "[s]ay goodbye to workout monotony with a variety of workout experiences. From studio sessions to global workouts and even cross-training options like yoga and strength conditioning, our world-class trainers provide limitless variety."[31]

85.    Defendant similarly advertises the NordicTrack Rower enabled with iFIT and a Console as a combination that permits "Interactive Training Sessions[,]" and by touting its "constantly growing library of global iFIT workouts feature AutoAdjust, allowing your compatible rower to adjust your resistance automatically based on trainer cues."[32]

86.    To market its workout streaming service to Class Device Consoles, Defendant claims that the service is backed by "proprietary software":

> Our innovative iFIT software is the common operating system that unites our experiential content and interactive hardware into one integrated platform. Our software is the connective tissue that provides members with a unique two-

---

[30] *Our Story*, iFIT, https://company.iFIT.com/en/our-story/ (last visited on January 18, 2023)..
[31] *Id.*
[32] *Rowing Machines*, NordicTrack, https://www.nordictrack.com/rowing-machines(last visited on January 18, 2023). .

way experience with iFIT's authentic trainers. Through iFIT's patented software, biometric data is monitored and workout variables including speed, incline, resistance and digital weight are dynamically adjusted in real time. Our interactive software optimizes our members' workout experience by removing the guesswork and providing personalized training. We further personalize workouts with our patent-pending SmartAdjust$^{TM}$ and ActivePulse$^{TM}$ technologies, which automatically adjust our equipment based on members' real-time fitness levels and heart rates. Our distinctive leaderboard allows members to connect and interact with a global community of like-minded people.

We strive to create the most compelling interactive content in the health and fitness industry. Our highly differentiated content seamlessly integrates with our proprietary software and interactive hardware, delivering a unique media form that we call "experiential content." Our members enjoy patented live interactive studio and outdoor workouts. Further, our members can access iconic fitness experiences with workouts filmed in more than 50 countries across seven continents. Our experiential content creates multi-sensory experiences that allow our members to see, hear and feel interactive workouts. Our content is developed and led by a team of over 180 world-class trainers in more than 60 categories including running, cycling, high-intensity interval training (HIIT), strength, boot camp and yoga, as well as new categories including mindfulness, nutrition and active recovery. Our recent acquisition of Sweat also gives our members access to additional differentiated content with over 5,000 unique workouts led by instructors who are globally recognized as top female fitness icons.[33]

87. Defendant touts the number of subscribers of its streaming services: "During fiscal 2021, we (including Sweat) streamed 142 million live and on-demand interactive workouts across our fitness products …. In fiscal 2021, our iFIT members participated in 112 million workouts, reflecting growth of 229% year over year."[34]

88. Defendant markets and sells Console-equipped fitness equipment to consumers through the following iFIT-owned brands: NordicTrack, ProForm, Freemotion, Weider, and Sweat, among many others.

---

[33] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited January 20, 2023).

[34] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited January 20, 2023).

89.    Below is a breakdown of the percentage of Defendant's total revenue generated by each of the foregoing brands and streaming subscriptions:



90.    iFIT touts that it "intentionally" offers a broad array of streaming-enabled, Console-bearing equipment across a wide range of price points in order to attract the largest possible customer base:

> We generate recurring subscription revenue on the industry's broadest range of **connected fitness hardware**, including treadmills, bikes, ellipticals, rowers, climbers, strength equipment, fitness mirrors, yoga equipment and accessories. **Our interactive hardware is intelligent—specifically designed and engineered to respond to our proprietary software and experiential content**. This unique combination allows our members to have an immersive experience that can only be found on our hardware.[35]

91.    iFIT advertises the following Console-bearing, iFIT-equipped <u>NordicTrack</u>[36] equipment as capable of providing streamed workouts[37]:

---

[35] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119311521288661/d12906 0ds1a.htm (last visited January 20, 2023).

[36] <u>https://www.nordictrack.com/</u> (last visited on January 18, 2023).

[37] <u>https://www.nordictrack.com/</u> (last visited on January 18, 2023).

| Treadmills[38] | Bikes[39] | Ellipticals[40] | Strength[41] | Rowers[42] |
|---|---|---|---|---|
| Commercial 1750 | S27i Studio Bike | FS14i | Fusion CST Studio | RW900 |
| Commercial 2450 | S22i Studio Bike | FS10i | Fusion CST | RW700 |
| Elite Treadmill | FREE S15i Bike | Commercial 14.9 | Vault: Complete | RW600 |
| Commercial X22i | Commercial R35 | FREE Commercial 9.9 | Vault: Standalone | |
| Commercial X32i | Commercial VR25 | Studio Elliptical | iSelect Voice-Controlled Dumbbells | |
| EXP 14i | Commercial VU 29 | SpaceSaver SE9i | | |
| EXP 10i | Commercial VU 19 | SpaceSaver SE7i | | |
| EXP 7i | | | | |
| Elite 1000 | | | | |
| FREE C 1100i | | | | |
| Elite 900 | | | | |

iFIT advertises the following Console-bearing, iFIT-equipped <u>Pro-Form</u>[43] equipment as capable of providing streamed workouts:

| Treadmills[44] | Bikes[45] | Ellipticals[46] | Rowers | Strength |
|---|---|---|---|---|
| Pro 9000 | Studio Bike Pro 22 | Pro HIIT H14 | Pro 750R Rower | Vue |
| Pro 2000 | Carbon CX | Pro HIIT H14 (Prev. Model) | Pro R10 Rower | |
| Carbon T14 | Studio Bike Pro | Carbot HIIT H7 | 440R Rower | |
| Carbon T10 | Pro C10R | Carbon EL | | |
| Carbon T7 | Pro C10U | Carbon E10 | | |
| City L6 | Hybrid Trainer XT | Hybrid Trainer XT | | |
| Trainer 9.0 | Studio Bike Limited | Carbon HIIT H10 | | |
| Trainer 8.0 | TDF CSC | | | |
| | 500 SPX | | | |

iFIT advertises the following Console-bearing, iFIT-equipped <u>Freemotion</u>[47] equipment as capable of providing streamed workouts:

---

[38] https://www.nordictrack.com/treadmills (last visited on January 18, 2023).
[39] https://www.nordictrack.com/exercise-bikes (last visited on January 18, 2023).
[40] https://www.nordictrack.com/ellipticals (last visited on January 18, 2023).
[41] https://www.nordictrack.com/strength-training (last visited on January 18, 2023).
[42] https://www.nordictrack.com/rowing-machines (last visited on January 18, 2023).
[43] https://www.proform.com/ (last visited on January 18, 2023).
[44] https://www.proform.com/treadmills (last visited on January 18, 2023).
[45] https://www.proform.com/exercise-bikes (last visited on January 18, 2023).
[46] https://www.proform.com/ellipticals (last visited on January 18, 2023).
[47] https://freemotionfitness.com/ (last visited on January 18, 2023).

| Treadmills[48] | Bikes[49] | Ellipticals[50] |
|---|---|---|
| I22.9 Incline Trainer | Coachbike | E10.9b Total Body Elliptical |
| I10.9b Incline Trainer | U22.9 Upright Bike | E8.9b Total Body Elliptical |
| T22.9 Reflex | R22.9 recumbent Bike | |
| T10.9 Interval Reflex | R10.9b Recumbent Bike | |
| T10.9b Reflex | U10.9b Upright Bike | |
| T8.9b | U8.9b Upright Bike | |
| | R8.9b Recumbent Bike | |

iFIT advertises the following Console-bearing, iFIT-equipped Matrix[51] equipment as capable of providing streamed workouts:

| Treadmills[52] | Bikes[53] | Ellipticals[54] |
|---|---|---|
| TF30 | R30 | E30 |
| TF50 | R50 | E50 |
| T30 | U30 | A30 |
| T50 | U50 | A50 |
| T75 | ICR50 | |
| Climbmill C50 | | |

92.    Each of the foregoing models of iFIT fitness equipment are equipped with a Console for streaming workouts and operating the equipment for exercises. Based upon widespread consumer complaints that following a mandatory software update, the Console becomes frozen and no longer operates rendering the entire machine inoperable, Plaintiffs allege

---

[48] https://freemotionfitness.com/machines-for-home-gym/incline-trainer/; https://freemotionfitness.com/machines-for-home-gym/treadmills/ (last visited on January 18, 2023).

[49] https://freemotionfitness.com/machines-for-home-gym/indoor-bikes/ (last visited on January 18, 2023).

[50] https://freemotionfitness.com/machines-for-home-gym/ellipticals/(last visited on January 18, 2023).

[51] https://matrixhomefitness.com/  (last visited on January 18, 2023).

[52] https://matrixhomefitness.com/collections/treadmills; https://matrixhomefitness.com/collections/climbmills (last visited on January 18, 2023).

[53] https://matrixhomefitness.com/collections/bikes (last visited on January 18, 2023).

[54] https://matrixhomefitness.com/collections/ellipticals (last visited on January 18, 2023).

upon information and belief that all of the foregoing models of Console-bearing iFIT equipment suffer from the Defect.

93.    As evidenced by its advertisements, Defendant is aware that consumers purchase iFIT equipment—and pay a premium for it—due to its Consoles that enable consumers to operate their machines and perform workouts thereon. Because the Consoles are the mechanism through which owners operate the equipment, and because those Consoles were rendered inoperable by Defendant's automatic, unavoidable software update, Plaintiffs' and Class members Class Devices are not totally inoperable and useless.

**B.  The Update Renders the Console and Hence the Machine Inoperable**

94.    Defendant publicly touts that its exercise streaming service is engineered to function seamlessly on Class Device Consoles:

> We design and develop our own software, content, and hardware to ensure these elements work in harmony across our portfolio of brands and products …. Our content is delivered by our patented streaming technology that connects our wide range of connected devices. This comprehensive technology stack allows our devices to seamlessly connect to our network of products and members. This network effect of interactive fitness devices drives high engagement, retention, and social interaction. We believe our member-centric platform is difficult to replicate and highly scalable into adjacent categories and verticals ….

> We are constantly improving and expanding our members' experience, which ensures high subscriber engagement, retention and satisfaction. We will continue to enhance our members' experience by developing new content, deploying new software and continually personalizing the ways our members engage with iFIT. Whether consumers are at home, outside or in commercial facilities, iFIT will provide experiential content on our expanding platform of interactive equipment, mobile apps and digital TV apps. [55]

95.    As noted above and reflected in the many consumer complaints reproduced below, Class Devices suffer from a Defect that results in a complete inability to operate the device by

---

[55] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited January 20, 2023).

locking the Consoles on an error screen. Thus, the Defect renders inoperable Class Devices, depriving Plaintiffs and the Class of the benefit of their bargain.

96.     iFIT's solution to the problem is to have the user perform a factory reset, but that does not fix the problem. After the factory reset, the Defect manifests as a white screen or other error screen.

97.     One Reddit user explained the issue as follows:[56]

Acceptable-Studio486 · 22 days ago

Happened to me a few days ago on a pro form IFIT treadmill. As I was going to use it I was prompted to do an "update" and the treadmill has been stuck between the IFIT white screen and I try to reboot/reset using the "paper clip" trick I get the "supported API 3" message looping back to the IFIT screen this is unacceptable especially if the error was caused by their own update

⬆ 1 ⬇  💬 Reply  Share  Report  Save  Follow

98.     Other users of different iFIT models report similar variations of what their screen looks like after the update and a factory reset:



Posted by u/borealisbrewing 2 months ago

**iFit Tablet Corrupted**

My NordicTrack T 7.5 S tablet screen was stuck on the white iFit screen. I followed the steps provided to use a paperclip in the pinhole to reset. However the screen now just defaults to a flashing screen and message that says "Supported API:3" with a robot image.

Has anyone else figured out how to fix this??

💬 62 Comments   ↗ Share   🔖 Save   ⊘ Hide   🏳 Report                89% Upvoted

---

[56] https://www.reddit.com/r/iFit/comments/ymzeno/ifit_tablet_corrupted/ (last visited on January 18, 2023).



cweckel2000 · 1 mo. ago

We just experienced this on our NordicTrack 2450. Support was terrible to work with and the best I could get them to do was give me 3% off a replacement console. $670 w/shipping (wouldn't even offer me free shipping!) to fix corrupt software....

Both the people on the phone and in chat basically said it is what it is. Pay up or enjoy your clothes rack. We will never be buying anything from iFit again.

⬆ 2 ⬇   💬 Reply   Share   Report   Save   Follow

99.     When the factory reset does not work to fix the Defect, consumers attempt to get live help from iFit's customer service. However, as was experienced by Plaintiffs and the Class, it is nearly impossible to actually reach a live customer service representative.

100.     One consumer reported that she has been on hold most of the day, and no one at iFIT actually answers the phone.[57]



_____

101.    When the reset does not work, and a consumer is actually successful in reaching an

iFIT customer support representative, the representative informs consumers that they have to

purchase a new Console. One user was charged $625.76 for the replacement.[58]



102.    Another consumer had to pay $700.00 for a replacement Console.[59]

---

[58] https://www.reddit.com/r/nordictrack/comments/zo60tc/ifit_update_corrupted_my_machine/
(last visited on January 16, 2023)
[59] *Id.*

 cweckel2000 · 1 mo. ago

I believe we had the same thing happen to us. Last month one day the screen was stuck on the iFit screen and performing a factory reset resulted in the API 3 error. Our 2450 treadmill is just shy of 3 years old so out of warranty.

Support gave me a 3% discount after I complained that I shouldn't have to pay $700 for a software bug. They also could have cared less if I was unhappy or never bought a product again. It was pretty frustrating...

It also took over 2 weeks for the console to ship. I asked for an update and was told it's in quality control ... yet was assured it was a brand new part. Something seems fishy if you ask me. The console just shipped yesterday so I've yet to receive it yet.

⬆ 3 ⬇   💬 Reply   Share   Report   Save   Follow

103.    As explained above, the Defect does not just render iFIT equipment incapable of streaming classes (which is the reason why consumers pay a premium for iFIT as opposed to other fitness machines), it actually renders the machine fully inoperable.

104.    One consumer reported that he has had a dead screen for over three months, he cannot get any help from iFIT's customer service, and he cannot operate his treadmill without the Console (console) being on.[60]

---

[60] https://www.facebook.com/groups/proform/permalink/1508735822969103 (last visited on January 16, 2023).



**Dhaval Gandhi**
I e had a dead screen for over 3 months now. Multiple phone calls with long holds, and what seem like incompetent customer services I still don't have a working treadmill. According to the repairman, the console will need to be replaced. The worst thing is that you can't operate treadmill manually, without console being on.

Like    Reply    Share    1w

105.    On information and belief, the Defect is caused by the update corrupting the Console's bootloader, requiring a full console replacement. Alternatively, the existing Console does not have the hardware capability to run the updated iFIT software.

**C.  Defendant's Knowledge of the Defect**

106.    Before Defendant placed Class Devices into the stream of commerce, it knew or should have known that Class Devices suffer from the Defect. Specifically, before pushing a mandatory, automatic, unavoidable software update to Class Devices, Defendant should have tested that update to make sure it did not cause any issues with the usability of Class Devices. Defendant was the only party with the opportunity and ability to take that preventative measure. Yet, Defendant made no effort to prevent or resolve the Defect prior to making Class Devices available for purchase.

107.    Defendant instead continued to manufacture and sell defective Class Devices, and push software updates thereto, while failing to cure (or make any effort to cure) the Defect.

108.    Defendant, upon information and belief, through (1) its own records of customers' complaints, (2) warranty and post-warranty claims, (3) internal pre-sale testing and internal investigations, (4) approval and mailing of replacement Consoles (5) other various sources, has

always known or should have known of the Defect in the Class Devices. Yet, at no time has Defendant disclosed the Defect to consumers, or warned consumers despite knowing the Defect persists today.

109. Defendant failed to adequately research, design, test and/or manufacture the Class Devices before warranting, advertising, promoting, marketing, and/or selling them as suitable for use in an intended and/or reasonably foreseeable manner.

110. Defendant is experienced in the design and manufacture of consumer fitness products such as the Class Devices and, therefore, in the ordinary course of its business conducts tests, including pre-sale testing, to verify the fitness products it sells—including the Class Devices—are free from defects and align with Defendant's advertisements, specifications, and intended use of the Class Devices.

111. Similarly, on information and belief, Defendant performs pre-release analysis and testing of each its models of Class Devices. Consequently, Defendant was aware well in advance of the sale of the Class Devices that their firmware was vulnerable to inoperability with the release of a software update such as the one that caused the alleged Defect.

112. Thus, Defendant knew of the Defect and/or Class Devices' susceptibility thereto, and its associated manifestations and harms prior to advertising and selling Class Devices, yet made no substantive design modifications to eliminate the Defect and attendant manifestations.

**D. Plaintiffs' and the Class' Reasonable Expectations**

113. When purchasing Class Devices, Plaintiffs and the Class expected the equipment to operate in accordance with its intended and ordinary purpose and as described by Defendant: to have a functioning Console that enabled Plaintiffs and Class members to use their devices for exercising and/or streaming high quality fitness classes thereto. Additionally, Class Devices were

marketed as being capable of saving workout histories and statistics in order to help users meet their goals.

114.    Plaintiffs and the Class reasonably expected Defendant—and Defendant was obligated—to disclose the Defect prior to or at the time of sale due to Defendant's superior and exclusive knowledge thereof.

115.    Defendant actively concealed from, and/or failed to disclose to, Plaintiffs and the Class the true defective nature of Class Devices, and failed to remove the Class Devices from the marketplace or take adequate remedial action to cure the Defect.

116.    As a result of the Defect, Plaintiffs and the Class did not receive the benefit of their bargain, and their Class Devices fail of their ordinary and intended purpose.

117.    As a consequence of Defendant's actions and omissions, Plaintiffs and the Class have been deprived of the benefit of their bargain, lost use of the Class Devices, and incurred lost time and costs, including repair and/or replacement costs, time spent in arranging and obtaining repairs, and inconvenience.

**E.  Defendant's Deficient Warranty Performance**

118.    Despite awareness of the Defect as set forth above, Defendant refuses to cure the Defect in Class Devices. Instead, Defendant suggests a factory reset and when the reset fails, makes its customer service representatives effectively unavailable through ineffective chat assistance, unreasonably long telephone call wait times, and unreturned phone calls.

119.    iFIT provides essentially the same Limited Warranty for all its brands, which promises that Class Devices are free from defects:

> iFIT, Inc. warrants this product to be free from defects in workmanship and material, under normal use and service conditions …. The frame is warranted for ten (10) years from the date of purchase. Parts are warranted for two (2) [or three

(3)][61] years from date of purchase. Labor is warranted for one (1) year from date of purchase.

120.    Thus, if a customer contacts iFIT within the warranty period of their defective device, iFIT is obligated to respond, and if necessary send replacement parts.

121.    However, instead of abiding by its warranty obligations, iFIT does nothing more that suggest a factory reset on its website. iFIT is otherwise, unreachable by chat or phone.

122.    The experience of the Class members is the same as that of Plaintiffs. The Defect arises from defective materials or workmanship in the iFIT devices and is therefore covered under iFIT's Limited Warranty. Yet iFIT refuses to fix the Defect, and instead suggests a factory reset, which is ineffective.

123.    Accordingly, iFIT's refusal to honor its warranty obligations renders their iFIT devices useless and deprives consumers of the benefit of their bargain.

124.    Alternatively, Defendant's refusal to honor its warranty obligations shifts the costs of the Defect onto its customer, who must pay to replace their defective Consoles.

125.    Notably, because the Defect manifests only after iFIT pushes its mandatory software update, iFIT is directly responsible for the manifestation of the Defect.

126.    The Defect that arises outside the warranty's limited period should also be remedied by iFIT at no cost because the warranty is procedurally and substantively unconscionable. Therefore, when the Defect arises, iFIT must be estopped from denying warranty claims on the grounds that the warranty has expired. Specifically, the Class Device warranty is procedurally unconscionable because:

a.    Consumers did not have a meaningful opportunity to participate in creating the warranty.

---

[61] The warranty period depends on the particular iFIT model and year of purchase.

     b.   iFIT is a nationally operating enterprise with a substantial market power to dictate the terms of the warranty to consumers.

     c.   iFIT created the warranty term that consumers had no choice or ability to alter.

     d.   iFIT offered the warranty to consumers on the "take-it-or-leave-it" basis.

The Class Device warranty is substantively unconscionable because:

     a.   The iFIT devices are a durable good.

     b.   It is material to a reasonable consumer that the iFIT devices will function properly without needing repair or replacement for a significant period of time.

     c.   Upon information and belief, at all relevant times, iFIT has had superior knowledge regarding the Defect present in the Class Devices due to its control over the design, manufacture, and/or testing of the Class Devices.

     d.   iFIT knew that its updated software is incompatible with its existing hardware or the hardware present in iFIT models that were manufactured prior to the software update.

     e.   Despite iFIT's superior knowledge of the existence of the Defect, and if the software update is released after the expiration of the applicable warranty period, a high likelihood that the Defect will only manifest after the warranty has expired, it nevertheless released the update.

127.     iFIT's warranty fails of its essential purpose because iFIT cannot cure the Defect.

128.     Due to the reasons explained above, no reasonable consumer would enter into an agreement with such terms.

129.     Accordingly, iFIT's warranty is unconscionable, and iFIT must be estopped from enforcing it against Class members.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

130.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the Defect as well as the omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Defect and could not reasonably discover the defect or Defendant's deception with respect to the Defect.

131.    At all times, Defendant was and is under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, character, nature and grade of the Class Devices and to disclose the Defect. Instead, Defendant omitted disclosure of the presence of the Defect and continues to sell Class Devices that contain the Defect, rather than repairing them prior to sale. Defendant actively concealed the true standard, quality, character, nature and grade of the Class Devices and omitted material information about the quality, reliability, characteristics and performance of the Class Devices. Plaintiffs and members of the Class reasonably relied on Defendant's knowledge and concealment of the facts alleged herein.

132.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment; further, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

**Nationwide Class:**
All persons or entities in the United States who purchased an iFIT Class Device.

**California Subclass:**
All persons or entities who purchased an iFIT Class Device in California.

**Ohio Subclass:**
All persons or entities who purchased an iFIT Class Device in Ohio

**Washington Subclass:**
All persons or entities who purchased an iFIT Class Device in Washington.

**Florida Subclass:**
All persons or entities who purchased an iFIT Class Device in Florida.

The California, Ohio, Washington, and Florida Subclasses shall be collectively referred to herein as the "State Subclasses," and together with the Nationwide Class as the "Class." Excluded from the Class are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Devices for purposes of resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

134.    <u>Numerosity</u>:  The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that the Class consists of hundreds of thousands, if not millions, of persons and entities that were deceived by Defendant's conduct.

135.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common factual and legal questions include, but are not limited to:

a.    Whether Defendant engaged in the conduct alleged herein;

b.    Whether Defendant designed, advertised, marketed, distributed, sold, or otherwise placed the Class Devices into the stream of commerce in the United States;

c.    Whether Defendant knew about, and failed to disclose, the Defect at the time Plaintiffs and the Class members purchased their Class Devices;

d.    Whether Defendant designed, manufactured, marketed, and distributed the Class Devices knowing that the Defect could and would occur;

e.    Whether Defendant's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

f.    Whether Defendant owed a duty to warn Plaintiffs and Class Members about the Defect;

g.    Whether Plaintiffs and the other Class members overpaid for their Class Devices;

     h.   Whether Defendant breached its warranties by failing to properly inspect and repair the Defect;

     i.   Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and,

     j.   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

136.   <u>Typicality</u>:  All of Plaintiffs' claims are typical of the claims of the Class since each Class Device was advertised with the same type of false and/or misleading statements, regardless of model or production year. Plaintiffs and the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all absent Class Members.

137.   <u>Adequacy</u>:  Plaintiffs are adequate Class representatives because his interests do not materially or irreconcilably conflict with the interests of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

138.   <u>Superiority</u>:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court

system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

139.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT,**
**15 U.S.C. § 2301, *et seq*. ("MMWA")**
(on behalf of the Nationwide Class or alternatively the State Subclasses)

140.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

141.    The MMWA provides a private right of action by purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty. 15 U.S.C. § 2310(d)(1).  As alleged herein, Defendant has failed to comply with its implied warranty of merchantability with regard to the Class Devices.

142.    The Class Devices are consumer products, as that term is defined in 15 U.S.C. § 2301(1).

143.    Plaintiffs and each member of the Nationwide Class and California Subclass are consumers, as that term is defined in 15 U.S.C. § 2301(3).

144.    Defendant is a supplier and warrantor, as those terms are defined in 15 U.S.C. §§ 2301(4)-(5).

145.    The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1).  Defendant breached the implied warranty of merchantability for the Class Devices, as alleged herein, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods.  Plaintiffs have suffered damages as a result of Defendant's breach of the implied warranty of merchantability as set forth herein. 15 U.S.C. §§ 2310(d)(1)-(2).

146.    Defendant was provided notice of the claims raised by Plaintiffs and was afforded a reasonable opportunity to cure.  Defendant failed to cure in that it has not offered a repair to Plaintiffs and consumers for the Defect.  Until Plaintiffs' representative capacity is determined, notice and opportunity to cure through Plaintiffs, and on behalf of the Class, can be provided under 15 U.S.C. § 2310(e).

147.    Defendant's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

148.    Plaintiffs and the members of the Classes have suffered, and are entitled to recover, damages as a result of Defendant's breach of express and/or implied warranties and violations of the MMWA.

149.    Plaintiffs also seek an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of this action. 15 U.S.C. § 2310(d)(2).  Plaintiffs and the prospective Classes intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## COUNT II
## BREACH OF EXPRESS WARRANTY
(on behalf of the Nationwide Class or alternatively the State Subclasses)

150.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

151.    Defendant provided all purchasers of the Class Devices with the same express warranties described herein, which became part of the basis of the parties' bargain.

152.    The parts affected by the Defect were distributed by Defendant in the Class Devices and are covered by the warranties Defendant provided to all purchasers of Class Devices.

153.    Defendant breached these warranties by selling Class Devices with the Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

154.    Plaintiffs notified Defendant of the breach within the warranty period, but Defendant already knew of the Defect and yet chose to conceal it and failed to comply with its warranty obligations.

155.    As a direct and proximate cause of Defendant's breach, Plaintiffs and the members of the Class bought Class Devices they otherwise would not have, overpaid for their Class Devices, did not receive the benefit of their bargain, and their Class Devices suffered a diminution in value. Plaintiffs and the Class have also incurred and will continue to incur costs related to the diagnosis and repair of the Defect.

156.    Defendant's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here.

157.    Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect.

158.     The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Devices were defective at the time of sale and would fail well before their useful lives.

159.     Plaintiffs and the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

### COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(on behalf of the Nationwide Class or alternatively the State Subclasses)

160.     Plaintiffs incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

161.     Defendant manufactured and distributed Class Devices throughout the United States for sale to Plaintiffs and Class Members.

162.     Defendant impliedly warranted to Plaintiffs and members of the Classes that their Class Devices were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

163.     As alleged herein, Defendant breached the implied warranty of merchantability because the Class Devices suffer from the Defect.  The Class Devices are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

164.     After Plaintiffs experienced the Defect and contacted Defendant without relief, Plaintiffs gave reasonable and adequate notice to Defendant that the Class Devices were defective, unmerchantable, and unfit for their intended use or purpose.

165.    Due to the Defect, Plaintiffs and the members of the Classes are unable to operate their Class Devices as intended, substantially free from defects. The Class Devices do not permit Plaintiffs and Class members to use their Class Devices for the very purpose for which they purchased them: to perform workouts thereon.

166.    Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and members of the Classes have been injured in an amount to be proven at trial.

## COUNT IV
## NEGLIGENT MISREPRESENTATION
(on behalf of the Nationwide Class or alternatively the State Subclasses)

167.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

168.    Defendant had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the substantial purchase of Class Devices.

169.    Defendant specifically and expressly misrepresented material facts to Plaintiffs and Class members, as discussed above.

170.    Defendant knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable consumer would be misled by Defendant's misleading and deceptive advertisements.

171.    Plaintiffs and the Class members justifiably relied on Defendant's misrepresentations and have been damaged thereby in an amount to be determined at trial.

## COUNT V
## FRAUDULENT CONCEALMENT
(on behalf of the Nationwide Class or alternatively the State Subclasses)

172.    Plaintiffs incorporate by reference the allegations of all foregoing paragraphs as if they had been set forth in full herein.

173.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Class Devices.

174.    Defendant, acting through its representatives or agents, sold the Class Devices throughout the United States.

175.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Devices, including that they suffered from the Defect.

176.    Rather than inform consumers of the truth regarding the Defect, Defendant concealed material information related to the Defect.

177.    Defendant's omissions were material because the Defect has a substantial impact not simply on the convenience and cost of Class Device maintenance, but also on the reliability of the Class Devices over time and Plaintiffs' and Class members' ability to use their Class Devices for the very purpose for which they purchased them: to workout.

178.    Defendant omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Devices, or would have paid substantially less for them, had they known the truth.

179.    Plaintiffs and the Class members had no way of knowing about the Defect.

180.    Plaintiffs and Class members could not have discovered the above information on their own, because Defendant was in the exclusive possession of such information.

181.    Although Defendant has a duty to ensure the accuracy of information regarding the performance of its Class Devices, it did not fulfill these duties.

182.    Plaintiffs and Class members sustained injury due to the purchase of Class Devices that suffered from the Defect.

183.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's Class Devices. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT VI
## UNJUST ENRICHMENT
(on behalf of the Nationwide Class or alternatively the State Subclasses)

184.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

185.    This claim is pled in the alternative to Plaintiffs' contract-based claims.

186.    Defendant knew or should have known that Plaintiffs and the class paid for the Class Devices with the expectation that they would perform as represented and were free from defects.

187.    Plaintiffs and the Class conferred substantial benefits on Defendant by purchasing the defective Class Devices. Defendant knowingly and willingly accepted and enjoyed those benefits.

188.    Defendant's retention of these benefits is inequitable.

189.    As a direct and proximate cause of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

<u>COUNT VII</u>
**BREACH OF EXPRESS WARRANTY**
**(Based on State Law on behalf of the State Subclasses)**

190.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

191.    Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the State Subclasses.

192.    California, Ohio, Washington, and Florida have adopted the relevant portions of the Uniform Commercial Code governing the sale of goods such as the Class Devices.

193.    Defendant is and was at all relevant times a "merchant" as defined under California, Ohio, Washington, and Florida law.

194.    The Class Devices are and were at all relevant times "goods" as defined under California, Ohio, Washington, and Florida law.

195.    Defendant provided all purchasers of the Class Devices with a warranty, which became a material part of the bargain.

196.    In the warranty, Defendant agreed to repair or replace all parts on the Class Devices that malfunction or fail during normal use.

197.    Defendant manufactured and/or installed all parts, including the Console, in the Class Devices; thus, the Class Devices and their component parts are covered by Defendant's warranty.

198.    The Defect at issue in this litigation was present at the time the Class Devices were sold to Plaintiffs.

199. Plaintiffs and State Subclass members relied on Defendant's express warranty, which was a material part of the bargain, when purchasing their Class Devices.

200. Under the express warranty, Defendant was obligated to correct the Defect in the Class Devices owned by Plaintiffs and State Subclass Members.

201. Although Defendant was obligated to correct the Defect, none of the attempted fixes are adequate under the terms of the warranty, as they did not cure the Defect.

202. Defendant breached the express warranty by performing illusory repairs. Rather than repairing the Class Devices pursuant to the express warranty, Defendant: (1) falsely informed State Subclass members that there was no problem with their Class Devices; (2) performed ineffective or harmful repairs; (3) replaced defective components with equally defective components; (4) informed Plaintiffs and State Subclass members that the Defect was Android's fault, not its own; and/or (5) re-calibrated or replaced original factory-installed equipment in an effort to hide evidence of the Defect. Defendant did not, however, actually repair the Class Devices.

203. Defendant has failed and refused to conform the Class Devices to the express warranty. Defendant's conduct, as alleged throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

204. Moreover, Defendant's attempt to disclaim or limit the express warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect.

205. The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and State Subclass members. Among other things, Plaintiffs

and State Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members, and Defendant knew or should have known that the Class Devices were defective at the time of sale.

206.    Plaintiffs and State Subclass members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

207.    Plaintiffs and State Subclass members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Defect from the complaints it received from Plaintiffs and State Subclass members, from repairs and/or replacements of the Class Devices or components thereof, and through other internal and external sources.

208.    Because Defendant, through its conduct and exemplified by its own software updates and troubleshooting suggestions, has attempted to repair the Defect under warranty, Defendant cannot now deny that the warranty covers the Defect.

209.    Because Defendant has not been able to remedy the Defect, any limitation on remedies included in the warranty causes the warranty to fail its essential purpose, rendering such limitation null and void.

210.    As a direct and proximate cause of Defendant's breach, Plaintiffs and State Subclass members suffered damages and continue to suffer damages, including economic damages at the point of sale. Additionally, Plaintiffs and State Subclass members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

211.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and State Subclass members have been damaged in an amount to be determined at trial.

## COUNT VIII
### BREACH OF IMPLIED WARRANTY, CAL. COM. CODE § 2314
### (Based on State Law on behalf of the State Subclasses)

212.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

213.    Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the State Subclasses.

214.    California, Ohio, Washington, and Florida have adopted the relevant portions of the Uniform Commercial Code governing the sale of goods such as the Class Devices.

496.    Defendants are and were at all relevant times a merchant with respect to the Class Devices as defined under California, Ohio, Washington, and Florida law.

497.    A warranty that the Class Devices were in merchantable condition was implied by law in the instant transaction, pursuant to California, Ohio, Washington, and Florida law.

215.    Defendant knew or had reason to know of the specific use for which the Class Devices were purchased. Defendant directly sold and marketed Class Devices to customers from its various websites and/or through authorized dealers, for the intended purpose of consumers purchasing the Class Devices. To the extent Class Devices were sold to State Subclass members directly through its various websites or through authorized dealers, Defendant knew that the Class Devices would and did pass unchanged from the authorized dealers to State Subclass members, with no modification to the defective Class Devices.

216.    Defendant provided Plaintiffs and the State Subclass members with an implied warranty that the Class Devices and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

217.    This implied warranty included, among other things: (i) a warranty that the Class Devices and their components, including their Consoles, that were manufactured, supplied, distributed, and/or sold by Defendant were reliable for providing workouts; and (ii) a warranty that the Class Devices would be fit for their intended use while the Class Devices were being operated.

218.    Contrary to the applicable implied warranties, the Class Devices and their components, including their Consoles, at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the State Subclass members with reliable workouts. Instead, the Class Devices are defective, beginning with the existence of the Defect at the time of sale and thereafter. Defendant knew of this Defect at the time these sale transactions occurred.

219.    As a result of Defendant's breach of the applicable implied warranties, Plaintiffs and the State Subclass members of the Class Devices suffered an ascertainable loss of money, property, and/or value of their Class Devices. Additionally, as a result of the Defect, Plaintiffs and the State Subclass members were harmed and suffered actual damages in that the Class Devices' Consoles are substantially certain to fail before their expected useful life has run.

220.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Devices were of merchantable quality and fit for such use under state implied warranty law.

221.    Plaintiffs and the State Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

222.    Plaintiffs and the State Subclass members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of warranty

would have been futile. Defendant was also on notice of the Defect from the complaints it received from Plaintiffs and the State Subclass members, from repairs and/or replacements of Class Device components thereof, and through other internal sources.

223.    As a direct and proximate cause of Defendant's breach, Plaintiffs and the State Subclass members suffered damages and continue to suffer damages, including economic damages at the point of sale of their Class Devices. Additionally, Plaintiffs and the State Subclass members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

224.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the State Subclass members have been damaged in an amount to be proven at trial.

<u>**COUNT IX**</u>
**VIOLATIONS OF SONG–BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY (CAL. CIV. CODE §§ 1790–1795.8) (Based on California Law on behalf of the Nationwide Class or, Alternatively, the California Subclass)**

498.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

499.    This count is brought under California law on behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass.

500.    Plaintiffs and the Class members who purchased the Class Devices are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

501.    The Class Devices are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

502.    Defendant is a "manufacturer" of the Class Devices within the meaning of Cal. Civ. Code § 1791(j).

503.    Defendant impliedly warranted to Plaintiffs and Class members that Class Devices

were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

504.    162. Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

      a.  Pass without objection in the trade under the contract description.

      b.  Are fit for the ordinary purposes for which such goods are used.

      c.  Are adequately contained, packaged, and labeled.

      d.  Conform to the promises or affirmations of fact made on the container or label.

505.    The Defect in the Class Devices is present in them when sold. The Class Devices would not pass without objection in the exercise equipment trade because the Defect renders the Class Devices useless and fail to operate as intended. The Defect thus affects the central functionality of the Class Devices.

506.    Because the Defect renders the Class Devices unfit for their ordinary purpose due to the Defect rendering Class Devices unusable, the Class Devices are not fit for the ordinary purposes for which were used and marketed.

507.    Class Devices are not adequately labeled because the labeling fails to disclose the Defect and does not advise the Class members of the Defect leading to the Class Devices being inoperable.

508.    Any attempt by Defendant to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to §§ 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and

performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). Defendant's attempted implied warranty disclaimer does not conform to these requirements.

509.    The Defect—which is a latent defect—deprived Plaintiffs and Class members of the benefit of their bargain and has resulted in Class Devices being entirely worthless, or worth substantially less than what Plaintiffs and other California Subclass members paid for them.

510.    As a direct and proximate result of Defendant's breaches of its implied warranties, Plaintiffs and Class members received goods that contain a Defect that substantially impairs their value. Plaintiffs and Class members have been damaged by the diminished value of the Class Devices, the Class Devices' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

511.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and Class members are entitled to damages and other legal and equitable relief, including, inter alia, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Devices, and reasonable attorneys' fees and costs.

## COUNT IX
### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE §§ 1750 *ET SEQ.* ("CLRA")
### (Based on California Law on behalf of the Nationwide Class or, Alternatively, the California Subclass)

512.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

513.    Plaintiffs bring this claim on behalf of the Nationwide Class or, alternatively, the California Subclass.

514.    Defendant is a person as that term is defined in California Civil Code § 1761(c).

515.    Plaintiffs and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

516.    Defendant engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Devices suffer from a Defect (and the costs, risks, and diminished value of the Class Devices as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

517.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

518.    Defendant knew that the Class Devices were defectively manufactured and not suitable for their intended use.

519.    Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Devices because:

a.    Defendants were in a superior position to know the true state of facts about the Defect and associated costs in the Class Devices;

b.    Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Devices had a Defect that rendered them totally inoperable until after purchasing them and manifestation of the Defect;

  c. Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Defect and the associated costs that it causes until manifestation of the Defect; and

  d. Defendants actively concealed the Defect and the associated costs by asserting to Plaintiffs and Class Members that their Class Devices were not defective.

520. In failing to disclose the Defect and the associated costs that result from it, Defendant has knowingly and intentionally concealed material facts and breached its duty to disclose.

521. The facts concealed or not disclosed by Defendant to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendant's Class Devices or pay a lesser price. Had Plaintiffs and Class Members known about the defective nature of the Class Devices, they would not have purchased them or would have paid less for them.

522. On or about January 19, 2023, Plaintiffs sent Defendant notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) and seek both injunctive relief and monetary damages, including actual, restitutionary, and punitive damages.

523. Plaintiffs' and Class Members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

524. Therefore, Plaintiffs and Class Members seek all relief available under the CLRA.

## <u>COUNT X</u>
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.* (Based on California Law on behalf of the Nationwide Class or, Alternatively, the California Subclass)

525. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

526. Plaintiffs bring this claim on behalf of the Nationwide Class or, alternatively, the California Subclass.

527.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

528.    Defendant has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Devices suffer from a Defect. Defendant should have disclosed this information because it was in a superior position to know the true facts related to the Defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the Defect.

529.    The Defect in Class Devices renders them totally inoperable and useless, which triggered Defendant's duty to disclose the Defect to consumers.

530.    These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Defect and suppressing other material facts from Plaintiffs and Class Members, Defendant breached its duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class Members. The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiffs and Class Members, as it would have been to all reasonable consumers.

531.    The injuries suffered by Plaintiffs and Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and Class Members should have reasonably avoided.

532.    Defendant's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

533.    Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendant, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT XI
### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.* (Based on California Law on behalf of the Nationwide Class or, Alternatively, the California Subclass)

534.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

535.    Plaintiffs bring this claim on behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass.

536.    California Business & Professions Code § 17500 states:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

537.    Defendant caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiffs and Class Members.

538.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the reliability and functionality of their Class Devices as set forth in this Complaint were material and likely to deceive a reasonable consumer.

539.    Plaintiffs and Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing their Class Devices, Plaintiffs and Class Members relied on the misrepresentations and/or omissions of Defendant with respect to the reliability and functionality of the Class Devices. Defendant's representations were untrue because the Class Devices are distributed with a Defect that fails to meet industry standard and/or otherwise enable Plaintiffs and Class members to utilize the Class Devices for the very purpose for which they purchased them: to perform workouts thereon. Had Plaintiffs and Class Members known this, they would not have purchased their Class Devices and/or paid as much for them. Accordingly, Plaintiffs and Class Members overpaid for their Class Devices and did not receive the benefit of their bargain.

540.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's businesses. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

541.    Plaintiffs, individually and on behalf of all Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and Class Members any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

<u>COUNT XII</u>
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR**
**TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq*.**
**(on behalf of the Florida Class)**

225.    Plaintiff Voorheis and the Florida Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

226.    Plaintiff Voorheis brings this claim on behalf of himself and on behalf of the Florida Class against Defendant.

227.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  Defendant engaged in unfair and deceptive practices that violated the FDUTPA as described above.

228.    Defendant engaged in "trade or commerce" in Florida within the meaning of the FDUTPA. *See* Fla. Stat. § 501.203(8).

229.    Defendant caused to be made or disseminated through Florida and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff Voorheis and the other Florida Class Members and otherwise engaged in activities with a tendency or capacity to deceive.

230.    In violation of the FDUTPA, Defendant employed unfair and deceptive acts or practices, fraud, false pretense, misrepresentation, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Devices. Defendant knowingly concealed, suppressed and omitted materials facts regarding the Defect and misrepresented the standard, quality, or grade of the Class Devices, which directly caused harm to Plaintiff Voorheis and the Florida Class.

231.    Defendant actively suppressed the fact that that Class Devices contain the Defect because of materials, workmanship, design, and/or manufacturing defects. Further, Defendant employed unfair and deceptive trade practices by failing to provide repairs of the Defect or

replacement of Class Devices due to the Defect within a reasonable time in violation of the FDUTPA. Defendant also breached its warranties as alleged above in violation of the FDUTPA.

232.    As alleged above, Defendant has known of the Defect contained in the Class Devices for years. Prior to selling the Class Devices, Defendant knew or should have known the Class Devices contained the Defect due to pre-production testing, quality control audits/investigations, and other pre-sale manufacturing/design assessments. Defendant also should have known of the Defect from the early complaints and service requests it received from Class Members and from other internal sources. Defendant nevertheless failed to disclose and actively concealed the Defect.

233.    Defendant's unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiff Voorheis and members of the Florida Class had no reasonable way to know that the Class Devices contained the Defect or were defective in workmanship, design, and/or manufacture. Defendant possessed superior knowledge as to the quality and characteristics of the Class Devices, including the Defect within its Class Devices, and any reasonable consumer would have relied on Defendant's misrepresentations and omissions, as Plaintiff Voorheis and members of the Florida Class did.

234.    Defendant intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Devices and the Defect present in Class Devices with an intent to mislead Plaintiff Voorheis and the Florida Class.

235.    Defendant knew or should have known that their conduct violated the FDUTPA.

236.    Defendant owed Plaintiff Voorheis and the Florida Class a duty to disclose the true nature, character, and reliability of the Class Devices and the existence of the Defect because Defendant:

    a.   Possessed exclusive knowledge of the Defect;

    b.   Intentionally concealed the foregoing from Plaintiff Voorheis and the Florida Class; and/or

    c.   Represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

    d.   Provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data, and other information to consumers regarding the performance, reliability, quality, and nature of the Class Devices;

    e.   Represented that goods or services were of a particular standard, quality, or grade, when they were of another;

    f.   Engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Devices, which did, or tended to, mislead Plaintiff Voorheis and the Florida Class Members about facts that could not reasonably be known by the consumer;

    g.   Failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    h.   Caused Plaintiff Voorheis and the Florida Class Members to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

    i.   Failed to reveal material facts to Plaintiff Voorheis and the Florida Class Members with the intent that Plaintiff Voorheis and the Florida Class Members would rely upon the omission; and

    j.   Made material representations and statements of fact to Plaintiff Voorheis and the Florida Class Members that resulted in Plaintiff Voorheis and the Florida Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were.

237.    Plaintiff Voorheis and the other Florida Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. In purchasing their Class Devices, Plaintiff Voorheis and the other Florida Class Members relied on the misrepresentations and/or omissions of Defendant with respect to the functionality and reliability of the Class Devices. Defendant's representations were untrue because the Class Devices are distributed with the Defect that prevents seamless streaming of iFIT

workouts. Had Plaintiff Voorheis and the other Florida Class Members known this, they would not have purchased their Class Devices and/or paid as much for them. Accordingly, Plaintiff Voorheis and the other Florida Class Members overpaid for their Class Devices and did not receive the benefit of their bargain.

238.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's businesses. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of Florida and nationwide.

239.    Plaintiff Voorheis, individually and on behalf of the other Florida Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to provide declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## COUNT XIII
## VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT (OHIO REV. CODE §§ 1345.01, ET SEQ)
### (On Behalf of the Ohio Class)

240.    Plaintiff Balfour incorporates by reference all preceding allegations as though fully set forth herein.

241.    Plaintiff brings this claim on behalf of the Ohio Class.

242.    Plaintiff and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA").

243.    Defendant is a "supplier" as defined by the OCSPA. Plaintiff's and the other Ohio Class members' purchases of Class Devices were "consumer transactions" as defined by the OCSPA.

244.    The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," if the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; … (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; … (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; … (11) Advertises goods or services with intent not to sell them as advertised [or] (12) Makes false statements of fact concerning the reasons for, existence of, or amounts of price reductions." By failing to disclose and actively concealing the Defect, Defendant engaged in deceptive business practices prohibited by the OCSPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

245.    Defendant knew that the Class Devices were defectively manufactured and were not suitable for their intended use. Defendant nevertheless failed to warn Plaintiff and Ohio Class members about the Defect despite having a duty to do so.

246.    Defendant owed Plaintiff a duty to disclose the Defect because Defendant:

i) Possessed exclusive knowledge of the Defect rendering the Class Devices susceptible to failure and/or inoperability;

ii) Intentionally concealed the Defect; and/or

iii) Made incomplete representations about the characteristics and performance of the Class Devices, while purposefully withholding material facts from Plaintiff that contradicted these representations.

247.    Defendant's unfair or deceptive acts or practices were likely to, and did, in fact, deceive reasonable consumers, including Plaintiffs, about the true performance and characteristics of the Class Devices.

248.    As a result of its violations of the OCSPA detailed above, Defendant caused actual damage to Plaintiff and the Ohio Class and, if not stopped, will continue to harm Plaintiff and the Ohio Class. The Defect has caused the Class Devices to become inoperable.

249.    Plaintiff and the Class sustained damages as a result of Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the OCSPA.

250.    Plaintiff also seeks court costs and attorneys' fees as a result of Defendant's violation of the OCSPA as provided in Ohio Rev. Code § 1345.09.

### <u>COUNT VII</u>
**Violation of the Washington Consumer Protection Act ("WCPA")**
**Wash. Rev. Code § 19.86.010 et seq.**
**(By Plaintiff Templon, Individually on Behalf of the Washington Subclass)**

251.    Plaintiffs incorporate and reallege the foregoing allegations of fact.

252.    Plaintiff Templon brings this claim individually and on behalf of the Washington Class.

253.    Plaintiff Templon, Washington Class members, and Defendant are "persons" under Wash. Rev. Code § 19.86.010(1).

254.    Defendant's acts and practices, as set forth above, occurred in the conduct of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

255.    The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or practices." Wash. Rev. Code § 19.86.020.

256.    Defendant's acts and practices, described herein, are unfair and deceptive in violation of Washington law. By selling defective Class Devices with exclusive or superior

knowledge of the Defect, and by failing to disclose the Defect or honor warranty claims in good faith, Defendant acted unscrupulously in a manner that is substantially oppressive and injurious to consumers.

257.    Defendant also engaged in unfair and deceptive trade practices in violation of Washington law by promoting the quality and functionality of the Class Devices, while failing to disclose and actively concealing the Defect.

258.    Defendant committed the deceptive acts and practices with the intent that consumers, such as Plaintiff Templon and Washington Class members, would rely on its representations and omissions when deciding whether to purchase a Class Device.

259.    Plaintiff Templon and Washington Subclass members suffered ascertainable loss as a direct and proximate result of Defendant's unfair and deceptive acts and practices. Had Plaintiff Templon and Washington Subclass members known that the Class Devices are defective, they would not have purchased a Class Device or would have paid significantly less for one. Among other injuries, Plaintiff Templon and Washington Subclass members overpaid for their Class Devices, and their Class Devices suffered a diminution in value and/or were rendered worthless as a result of the Defect.

260.    Defendant's violations of the WCPA and refusal to acknowledge that the Class Devices are defective present a continuing risk to Plaintiff Templon and Washington Subclass members, as well as to the general public. Defendant's unlawful acts and practices adversely affect the public interest.

261.    Under Wash. Rev. Code § 19.86.090, Plaintiff Templon and the Washington Subclass seek an order enjoining Defendant's unfair and deceptive acts and practices, providing

for appropriate monetary relief, including trebled damages, and awarding reasonable attorneys' fees and costs.

262.    In accordance with Wash. Rev. Code § 19.86.095, a copy of this Complaint has been served on the Attorney General of Washington.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class defined above, respectfully request that the Court enter judgment against Defendant and award the following relief:

A.    Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Appropriate injunctive and/or declaratory relief—including public injunctive relief—such as, *inter alia*, an order that requires Defendant to repair, recall, and/or replace the Class Devices and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Defect;

D.    An award of appropriate damages to repair or replace the Class Devices;

E.    A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

F.    An order awarding any applicable statutory and civil penalties;

G.      An order requiring Defendant to pay both pre- and post-judgment interest on any

amounts awarded;

H.      An award of costs, expenses, and attorneys' fees as permitted by law; and

I.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues so triable.


DATED: January 20, 2023                Respectfully submitted,

                                       By: */s/ Ian Connor Bifferato*
                                       Ian Connor Bifferato (DE Bar No. 3273)
                                       **THE BIFFERATO FIRM**
                                       1007 N Orange Street, 4th Floor
                                       Wilmington, DE 19801
                                       Telephone: (302) 429-0907
                                       cbifferato@tbf.legal

                                       Daniel O. Herrera
                                       Edward Khatskin
                                       **CAFFERTY CLOBES MERIWETHER
                                         & SPRENGEL LLP**
                                       150 S. Wacker Dr., Suite 3000
                                       Chicago, Illinois 60606
                                       Phone: (312) 782-4880
                                       Facsimile: (312) 782-4485
                                       dherrera@caffertyclobes.com
                                       ekhatskin@caffertyclobes.com

                                       Joseph G. Sauder
                                       Mark B. DeSanto
                                       **SAUDER SCHELKOPF**
                                       1109 Lancaster Avenue
                                       Berwyn, PA 19312
                                       Telephone: (888) 711-9975
                                       Facsimile: (610) 421-1326
                                       jgs@sstriallawyers.com
                                       mbd@sstriallawyers.com

                                       *Attorneys for Plaintiffs*